We have four argued cases this morning. The first one is number 14-1641, Ergowerx International v. Maxell Corporation. The District Court committed numerous reversible errors, several of which compounded each other. Could I be clear of what's left of your claims under the District Court's decision? There are some contract claims, and that would include a claim, as I understand it, that Maxell sold outside of the authorized channels of distribution, right? Well, the District Court held that it had no supplemental jurisdiction. Oh, I understand, but he didn't dismiss that claim? It dismissed part of the contract claim. I understand, but the particular contract claim that I just mentioned is preserved, right? Correct. Okay. The District Court committed a number of errors. First off, it held that there was patent exhaustion in this case and dismissed all of the patent claims. Now, that issue is now going to be before this Court in Bank based on the Lexmark v. Impression issue, but at least as it stands now, those positions remain in place. The Mallincrott case has not been overruled, and the Jazz Photo case has not been overruled, and there's still finding on this Court in patent exhaustion for conditional sales. Can I ask this? Tell me why affirmance of the exhaustion ruling, not on every ground that Judge Engelmeyer recited, but isn't sufficient on the following ground. What governs is the first sale. That's your sale to Maxell, not Maxell's sales later. Section 7.1 or 4, I forget what the provision is. I think you know the provision. Yes. Seems to be an unconditional sale. I don't read your briefs as saying that sale, the sale of all the things that you actually transferred title to, free and clear of patent claims to Maxell, is somehow negated or nullified if later Maxell breaches other provisions of the contract. In that view, we have here an unconditional sale, and there's no question about exhaustion applying to an unconditional sale. There are several reasons why I think that there is a conditional sale here. First off, New Jersey law, which the Court failed to apply in interpreting the contract, holds that the party's intentions is always subject to intrinsic evidence, and that the party's intention is the primary overriding goal in contract interpretation is figuring out what those intentions were. Therefore, those provisions, including Section 7.1, would be subject to the parties introducing extrinsic evidence into what they meant. There are several other reasons why 7.1 wouldn't apply and why there are conditions that are imposed. First off, at the very beginning of the contract, it says that the sales are subject to the conditions and terms of this agreement. It's plaintiff's position that that would include Section 3.10, which restricts the places that Maxell can sell. But not explicitly, it doesn't. Well, to the extent it's ambiguous, then it would certainly be subject to intrinsic evidence and would not be subject to dismissal at the pleading stage where the plaintiff submits that that provision does not provide for an unconditional sale. Also, 7.1 has to be read in context with 7.1A, and by A I mean the capital A that follows it where it says patent right, and that references third-party claims with respect to infringement claims. Section 9.1 also references third-party claims, and so those provisions all have to be read together in interpreting what Section 7.1 is. Plaintiff would take the position that 7.1 was only meant to cover sales that were authorized and through channels that were authorized, and it was simply a warranty against third-party claims. And under New Jersey law, where even an unambiguous contract is still subject to submission of intrinsic evidence to explain what provisions meant and where the words of the contract don't always control, it was error to dismiss those claims by finding that there was an unconditional sale based on a provision when the parties dispute what those provisions mean. Can I switch topic and ask you to explain a little bit more about the trademark claim? Is your trademark infringement claim one that includes any allegation that what Maxell was selling while using the Smartfish name was a modified good from the good it bought from Smartfish? Well, our trademark claims encompass more than just the sale of the product. They encompass Maxell putting the trademark and setting up a website where they sold the products online in use of the trademarks to sell the products online. But what about the products themselves? The products themselves differed from the products that Smartfish itself sold, but they were the same products that were sold to Maxell. There's no claim that Maxell modified those products. Or improperly packaged them. Or improperly packaged them. However, one of the issues that is important in this case, and because of the special significance of discovery in trademark cases, the discovery has not taken place. And so Maxell, the plaintiff's position is that Maxell sold in the wrong channel. And the plaintiff has not had an opportunity to discover how many products were sold in the authorized channels versus how many were sold in the unauthorized channels. How does that relate to a trademark claim? Well, because to the extent that all of Maxell's sales or the vast majority of Maxell's sales were through the unauthorized channels, then what you would have is you would have a situation where substantially all of the products that were being sold in the unauthorized channels were different than the ones that Smartfish itself was selling. But not different from the ones that Maxell was selling in the authorized channels. Right, but there hasn't been discovery to discover if Maxell sold any in the authorized channels. And so under the cases like SKFUSA and Boudreaux that judge basically whether some or substantially all of the products were sold in the unauthorized channels, you would have a situation where discovery may very well result in the proof that all of the... I'm not really following this argument at all. Are you saying that there's two different trademarks Smartflash owns? One that they use for sales to Maxell and one they use for sales in the E universe? No, what I'm saying is that there are products that Maxell was sold and all of those products differ from the ones that Smartfish sold. I'm not sure what the significance of that is. If the products sold in the authorized channels and the unauthorized channels were the same. Well, as I read the Boudreaux cases and the SKFUSA cases, they had to do with whether or not someone was importing products in an unauthorized manner that differed from the ones that had been authorized. And to the extent that a company or a licensor was allowing some to be coming in licensed and some to be coming in unlicensed, then you had to prove that substantially all of the products that were coming in were not genuine. And in our understanding, Maxell basically, instead of selling through its authorized channels, which it was having difficulty in, it just dumped them all into the unauthorized channels. And so, therefore, the unauthorized products were all different than... So, is the confusion that the goods that Smartfish is selling in the e-commerce is different from the goods they sold to Maxell to sell in the retail stores? Correct. And so, if somebody goes online and is looking for a Smartfish product online, they have the danger of getting a Maxell-supplied product rather than the Smartfish direct product and that they're different products. Correct. And we identified in our briefing a whole bunch of things. There were different components, molding software, graphics, the weight, the dongle, the manual, the batteries, the packaging, the labeling, and the performance. Was it interactive with Smartfish's website and things of that sort? So, the short answer is yes, they were significantly different in that regard. And so, while Maxell's argument is, hey, we are selling a bunch in the authorized channels, we're selling a bunch in the unauthorized channels, and, therefore, SKF USA would apply, Boudreaux would apply, but discovery hasn't taken place, and so there's been no evidence that shows whether there were any authorized sales by Maxell or if they were all unauthorized. We're running short on time. Let me bring you to another issue here, which is the fraud allegation. There's a line of cases in the Second Circuit, and since this case originated in the Southern District, we would follow Second Circuit law on this, which says, in terms of pleading, that you have to plead something other than a general allegation of fraudulent intent. You have to plead something that would suggest that it would support a notion of fraudulent intent. And here, it seems to me, well, first of all, do you agree that that's the law of the Second Circuit? Well, I believe that we, one, pled fraud, and two, that we... No, no, no, answer my question. Is that the law of the Second Circuit? Do you understand that to be the law of the Second Circuit? Yes, but I also believe that we pled many instances that support the plausibility of fraud. Okay. What are those pleadings? We talked about the fact that there was, there's motive, there's opportunity. Smartfish basically, Maxell had a declining set of, they were in a bad market. Why did that support a fraudulent action on their part as opposed to just a desire to enter into a contract? Well, first off, we alleged, and at our stage it has to be taken as true, numerous things that were false when made. They didn't have capabilities. They didn't have the capability to put things on the shelves unfettered without... But you don't cite or plead any evidence that they knew that that was the case. Well, those things were simply not true. But stay with me. What's the allegation, other than the statement it's not true, to suggest that there was evidence that it wasn't true? They did not have the capabilities to put it on the shelves. Things were not put on the shelves. They didn't have the capability to, they didn't have the distribution channels that they claimed. But you don't plead anything that would suggest that they recognized at the time that they lacked the capability, right? Well, I think that... I mean, their representations are consistent with perhaps an over-optimistic view of what they could accomplish too. No, if they say we have existing distribution channels, then they either do have it or they don't have it. Your position is they would know that. They would know that. And that if they say that we have the ability to place things on the shelves without requiring approval, then they either have that ability or they don't have that ability. But you don't plead anything that suggests a knowledge of the falsity of that representation at the time, such as a prospectus that says they didn't have capability or they're worried about lack of capability. Well, but those are facts that we're entitled to discovery on, and at the pleading stage, we're entitled to that. Well, but if I understand the Second Circuit line of cases, they suggest that in order to plead fraud, you do have to allege such facts, not wait until the discovery to develop them. But they also say that fraudulent intent can be shown by motive, opportunity, and circumstantial evidence of conscious behavior. And we certainly plead motive and opportunity. We plead that they were in a declining market and that they were trying to get this innovative product and that Smartfish was already in market and they already had developed channels and it was already in those stores in the accounts that they turned over to Maxell. Okay, well, you're out of time, but is there any other – there are many different issues here. Is there any additional issue that you particularly want to address? We certainly would like to recognize that, one, that the New York law allows for even ambiguous contracts to be interpreted and for all the terms to be interpreted, and we think that that affects the purchase agreement. It also affects the other – many of the other claims, the conditional sales, and also what's inside the contract, the scope of the contract that affect all of the different claims. We also would want to have it recognized that the court itself found in the context of the fraudulent inducement claim that there were a number of extra contractual things that identified three, and then it went on to identify that the batteries were also an extra contractual thing. But when it turned around to the economic – economic loss doctrine, it simply ignored all of the things that it found that the plaintiff had pled that were external to the contract. Any further questions? Okay, thank you. We'll give you two minutes for rebuttal. Ms. Preston? Good morning, Your Honors. Hillary Preston from Vincent Elkins from Maxell. I wanted to start with one of the last arguments that we just heard, which is that the need for discovery impacts both the patent claims, the trademark claims, and the contract claims. To the extent he's arguing now that he needed discovery to respond to the patent infringement dismissal and the trademark infringement dismissal, that's not an argument that he's made before, and so it should be waived. With respect to the patent infringement case, as Your Honors have recognized, this is not a case that involves a conditional sale doctrine. It just doesn't. How do we know that if New Jersey law allows a finding about the contract that might not be apparent on the face of a single provision? First, just taking a step back, I don't think the position that extrinsic evidence is always required is sustainable. We see that there have been numerous decisions that we've cited in our briefing where – What I'm understanding to be the position of the other side is if you look at 7.1, it says one thing and you look at nothing else. But if you broaden your focus and in particular go back to the beginning of the contract and it says, in exchange for the various mutual reciprocal promises or something, we're going to do all these things. Now we've got reason in the body of the contract as a whole to wonder whether 7.1 is really conditional on compliance with performance of other provisions, and we can't conclude just on the face of the contract that the sale from them to you was unconditional. I think this Court's decision in Abbott makes clear that even under New Jersey law, there are situations in which you do not get to look outside of the contract. You do not get to look to extrinsic evidence. And when you do have a language that is as clear as 7.1, which literally says free and clear of any claims, including patent claims, I'd argue that you can't get much more unconditional. And that would be a situation, as this Court recognized in Abbott, that there's a clear language that's in the contract. There's no need for extrinsic evidence, and in fact, it would be improper to look to extrinsic evidence to vary the terms of that provision. Is there an allegation in the complaint that this was a conditional sale from Berger Works to Maxell? I don't believe so. If it's in there, I have missed it. I think we only see that argument in response to our original motion to dismiss. Okay. Can I ask you a question about the, at least in my experience, somewhat odd procedural posture here? The district court ruled on a whole host of state law claims. It ruled on, let's say, half of one state law claim. And then it declined to exercise jurisdiction under 1367 over the very state law breach of contract claim that the Court had just addressed part of. That seems odd, and I'm not quite sure what question follows from it. Well, I maybe can provide some context. So we moved on all the claims, as Your Honors know, except for a portion of the breach of contract claim. And with respect to the breach of contract claim, our motion to dismiss was directed just to an excessive amount of damages that was being sought. That's all that the Court ruled on on the breach of contract claim. Then when the Court made the ruling on everything else, he invited the parties to put in additional briefing addressing whether or not there was even diversity in the case. Are you aware of any other case in which 1367 supplemental jurisdiction was declined over a claim, and 1367 is written in terms of a claim, after an issue relevant to the adjudication of that claim has, in fact, been adjudicated by the district court? I am not, off the top of my head, no. I'm not. I mean, I certainly think it's within the discretion since supplemental jurisdiction is something within the district court's discretion as to whether or not they want to exercise it. But I'm not aware of a case that has that exact posture. Was there any objection by Ergoworks to the dismissal, the refusal to exercise supplemental jurisdiction over the remaining contract claims? And I'll let Mr. Nelson speak for himself. As I understood their objection, it was only to the fact as to whether or not there was complete diversity between the parties. To address the substance of whether or not there was diversity, but not the Court's ability to dismiss that or the propriety of dismissing at that point. Can you address the trademark discussion that we were having, which I'm a little bit confused. First, I guess, as to what relevant cases say could constitute a trademark infringement claim when, as here, which I think is undisputed, everything Maxell was selling was unaltered from what Smartfish had sold to Maxell. And yet, the theory is there could be a trademark infringement or some sort of item act claim in that circumstance. And I think it is a fairly unique situation. I mean, yes, we have goods that were produced by Smartfish with genuine marks on them, sold to Maxell, and then the alleged wrongdoing is that Maxell sold them within the U.S. within unauthorized channels. None of the cases that Smartfish discusses involve the situation in which there are no material differences between a category of goods that's authorized to be sold within the U.S. and a category of goods that they say is somehow unauthorized because it's within the U.S. within an improper channel. But your friend said that the goods they intended to sell in the e-commerce channels were different than the goods they sold to you for sale in retail channels. Correct. Is that an allegation not in the complaint? No, that allegation is in the complaint. I think that that may not be the definitive question because I don't think I've seen any cases where the question is, are the allegedly infringing goods different from ones the trademark holder itself is selling as opposed to the question being, are the allegedly infringing goods different from ones that are authorized within the U.S.? And so if we look at the case of Original Appalachian, which is actually one of the cases cited by Smartfish, that case makes clear, and that's a Second Circuit decision, makes clear that the question of where the material differences lie is a question between the allegedly infringing goods and other goods authorized within the U.S. So here we know by Maxell's own pleading and the contract itself, Smartfish is pleading, Smartfish certainly authorized the exact same goods to be sold by Maxell in the U.S. as it is now saying somehow have material differences that bring them back within the scope of trademark infringement. But you don't think that they're allowed to say, we don't want certain goods sold in the e-commerce because we don't want e-commerce consumers to be confused whether they're buying this specific version versus the retail version? I'm not aware of a case that allows that to be enforced as a matter of trademark. What about, I don't know the name of the case and the facts are fuzzy, but there was something about like from Germany, I think, like some kind of objects and somebody had an exclusive license for a certain quality level of objects and somebody else was selling genuine articles from this company, I think in Germany, but not of the same kind of quality that the American exclusive licensee wanted sold and they found that that was a suitable gray market claim that because the American company had the exclusive trademark or the exclusive right to sell a particular class of these trademark goods that somebody selling lower quality goods, even though genuine, bearing the same trademark, violated the trademark laws. Right, and I think that that implicates two important differences from what we have and you do see the gray goods cases where there's either a question of quality control procedures not being followed or material differences, right? That either one of those can bring you back within that category of gray goods. Right, but that's why I ask you. I think your friend did allege that there are material differences here between the two goods. It may not be quality, but they may operate differently or things like that. Right. If that allegation is true, isn't that enough to make this analogous at least to those gray goods cases? I don't think it is. I think because you do have an entire class of goods that Smartfish has authorized within the U.S. If in the gray goods cases they had been authorized to sell the lower quality goods in the United States, there wouldn't have been any trademark claim. Correct. So I guess your position is that's essentially what happened here. They were authorized to sell these goods. Correct. That's the point I'm trying to inarticulately address is when we look at where do we compare material differences, we have to look at the difference between the allegedly infringing product and other products authorized within the U.S. Here, there can be no question that those are identical because Smartfish authorized both sets of goods. They authorized ones for Maxell to be the exclusive brick-and-mortar seller. Why is it appropriate just to talk about territorial regions rather than trades of commerce? Couldn't Smartfish separate out the e-commerce and the retail commerce and say, I don't want any of these goods that we're selling to Maxell sold in the e-commerce region? I think it could as a matter of contract. I'm not aware of a case that allows that delineation as a matter of a trademark enforcement issue. And I don't think that Smartfish points to one. So on the fraud and the inducement, Rule 9 allows essentially conclusory pleading of intent as long as there are sufficient details about the conduct to make the allegation plausible. Why are the allegations here about the conduct, in particular the one about having distribution channels in place not sufficient? Since that at least, not using the word ability, just actually having channels in place is something that surely Maxell knew what it had in place. I think we come back to the line of cases. I agree that pleading the knowledge is not a Rule 9 issue. We don't need the particularity required by Rule 9. We can have knowledge and intent pleaded generally. But I think what the district court found, which I think is correct, is that we still don't have here any facts to support an inference that any of those statements were false when made. That's going to be the key thing. Even under Twombly and under Rule 8, you still have to have a set of facts that allows an inference that the speaker, when made, knew that the statement they were making when they were making it was false. I don't think we have any facts that support that inference here. I'm not sure whether you meant to say two different things or not. Hopefully not. No, I don't mean opposite things. One thing is whether they were false when made. The other is whether Maxell knew they were false when made. Are you making the point about the knowledge? Yes. I think that's where, if you look back at Judge Engelmeyer's decision, he really found, even for those allegations that he considered to be extraneous to the contract, they still failed because they were forward-looking and there were no associated facts that allowed the inference that the speaker knew that those statements were false when they were making them. Capability is not forward-looking. That's a present fact. True. I'm not sure that the allegations actually would qualify as present capability rather than some future-looking... Let's assume we view it as present capability. What else would they have to allege that would satisfy the Second Circuit cases about intent? I think you still have to have, other than just the statement that turns out not to be true, I think you still have to have supporting facts that allow an inference that the speaker knew that those statements were not true. All we have here is just the statement that these were false when made. It's that conclusory in the complaint. And I would note that one of the decisions that Smartfish relies upon to support their inference, to support their conclusion that you can just say the speaker knew they were false and that's enough, is the PNY Tech case. That case actually involved a different type of fraud claim. It's the equitable fraud claim that doesn't have an element of intent in it. As a slide aside, there is a suggestion in the reply brief before your court that Smartfish would plead in the alternative and equitable fraud claim. I would like to point out that is a separate cause of action under New Jersey law that is not at issue in this case. That should not be considered as part of... Because they didn't plead it. Yes, it's not been pleaded in this case. Any further questions? Okay. Thank you, Ms. Preston. Thank you. Two minutes. Two minutes. I thought I had three. Well, you've used up all your time. We generously gave you two minutes. Thank you. I don't think you should complain. I appreciate the court's indulgence. I'd point out that Paragraph 96 of the complaint addresses contractual restrictions that were in place in the contract. With respect to the equitable fraud, I would say that it's my understanding that if a pleading supports any cause of action, even if it's not specifically laid out, that it should still be allowed to go forward, particularly in a situation where we were not given a chance to replead. I would also point out with respect to what types of trademark violations are alleged that there are several different types of trademark things where the first sale doesn't bar claims. One is intentional interference. We cite a case called Quicksilver in our brief. Another is that sellers are not immune from liability when they sell genuine goods purchased by deceptive means. There are certainly allegations that there were deceptive purchases here. That's the 7-11 case cited in our brief. And the use of a trademark on one's website constitutes per se trademark infringement, and that's the Partners for Health case that we cited. I would mention that with respect to the Abbott case, that there's later law that we cited like Mylan that supersedes that case and postdates that case, but the holding in Conway remains in place. It relied on it, and the Conway decision expressly says that even ambiguous contracts can be interpreted. So to the extent that the Abbott case is being represented as restricting the use of intrinsic evidence to explain existing contract terms, then that's not consistent with New Jersey law. Did you allege in the complaint that this was a conditional sale from Ergo Works to Maxell? Yes, that's what I was pointing out. Paragraph 96, we allege that these sales were based on contractual restrictions. We also listed throughout the complaint what they were. Paragraph 96, what page is that? Page 99. It's page 99 of the record. By breaching the contractual restrictions limiting the distribution channels, we talk about, that's talking about page 310, section 310. I don't think there's anything in this paragraph that says that your sales to Maxell were somehow conditioned on Maxell living up to all of its promises in the contract. Well, at the beginning of the contract itself, which is an appendix to the contract, it says that the sales are based on the conditions and terms in this contract. No, but we're talking about the allegations of the complaint. Not the contract itself. The question is, did you allege that the sale from Ergo Works to Maxell was a conditional sale? And I think what we're suggesting to you is we're not finding that in the complaint. Well, I think we certainly said that there were restrictions in the contract that governed it and that Maxell was not allowed to sell outside those channels. And I think under the definition of an authorized sale, you have to have a sale that is in compliance with your licensing and your restrictions. And so, therefore, we would argue that our complaint taken as a whole, particularly with the contract, does provide for a finding that we're arguing that there's no patent exhaustion because there was conditions that were violated and that the sales were not authorized. We certainly argue that the sales were not authorized. Okay. Thank you, Mr. Malcolm.